**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| PAMELA COHEN and SETH COHEN,<br><br>                    Plaintiffs,<br><br>    - against -<br><br>EQUIFAX INFORMATION SERVICES,<br>LLC; EXPERIAN INFORMATION<br>SOLUTIONS, INC.; TRANS UNION, LLC;<br>and CARRINGTON MORTGAGE<br>SERVICES, LLC,<br><br>                    Defendants. | Case No.:<br><br>**COMPLAINT AND DEMAND**<br>**FOR JURY TRIAL** |

Pamela Cohen ("Plaintiff Pamela") and Seth Cohen ("Plaintiff Seth") (together, the "Plaintiffs"), by and through the undersigned counsel, bring this action on an individual basis, against Equifax Information Services, LLC ("Defendant Equifax" or "Equifax"); Experian Information Solutions, Inc. ("Defendant Experian" or "Experian"); Trans Union, LLC ("Defendant Trans Union" or 'Trans Union") (collectively, the "Credit Bureau Defendants"); and Carrington Mortgage Services, LLC ("Defendant Carrington" or Carrington"); (all defendants collectively, "Defendants"), and states as follows:

## INTRODUCTION

1.     The computerization of our society has resulted in a revolutionary increase in the accumulation and processing of data concerning individual American consumers. Data technology, whether it is used by businesses, banks, the Internal Revenue Service, or other institutions, allows information concerning individual consumers to flow instantaneously to requesting parties. Such timely information is intended to lead to faster and better decision-making

by its recipients and, in theory, all of society should ultimately benefit from the resulting convenience and efficiency.

2.      However, unfortunately this information has also become readily available for, and subject to, mishandling and misuse. Individual consumers can and do sustain substantial damage, both economically and emotionally, whenever inaccurate or fraudulent information is disseminated and/or obtained about them. In fact, the Credit Bureau Defendants acknowledge this potential for misuse and resulting damage every time they sell their respective credit monitoring services to a consumer.

3.      The ongoing technological advances in the area of data processing have resulted in a boon for the companies that accumulate and sell data concerning individuals' credit histories and other personal information. Such companies are commonly known as consumer reporting agencies ("CRAs").

4.      These CRAs sell information to readily paying subscribers (i.e., retailers, landlords, lenders, potential employers, and other similar interested parties), commonly called "consumer reports," concerning individuals who may be applying for retail credit, housing, employment, or a car or mortgage loan.

5.      Since 1970, when Congress enacted the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.* ("FCRA"), federal law has required CRAs to implement and utilize reasonable procedures "to assure maximum possible accuracy" of the personal, private, and financial information that they compile and sell about individual consumers.

6.      One of the primary purposes in requiring CRAs to assure "maximum possible accuracy" of consumer information is to ensure the stability of our banking system:

> The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit

reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.

See 15 U.S.C. § 1681(a)(1).

7.      The preservation of one's good name and reputation is also at the heart of the

FCRA's purposes:

> [W]ith the trend toward computerization of billings and the establishment of all sorts of computerized data banks, the individual is in great danger of having his life and character reduced to impersonal "blips" and key-punch holes in a stolid and unthinking machine which can literally ruin his reputation without cause, and make him unemployable or uninsurable, as well as deny him the opportunity to obtain a mortgage or buy a home. We are not nearly as much concerned over the possible mistaken turn-down of a consumer for a luxury item as we are over the possible destruction of his good name without his knowledge and without reason. Shakespeare said, the loss of one's good name is beyond price and makes one poor indeed.

*Bryant v. TRW, Inc.*, 689 F.2d 72, 79 (6th Cir. 1982) [quoting 116 Cong. Rec.

36570 (1970)] (emphasis added).

8.      The FCRA also requires CRAs to conduct a reasonable reinvestigation to determine whether information disputed by consumers is inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which the CRA receives the notice of dispute from the consumer. This mandate exists to ensure that consumer disputes are handled in a timely manner and that inaccurate information contained within a consumer's credit report is corrected and/or deleted so as to not prevent said consumer from benefiting from his or her credit and obtaining new credit.

9.      In light of these important findings and purposes, Congress specifically noted "a need to insure that [CRAs] exercise their grave responsibilities with fairness, impartiality, and respect for the consumer's right to privacy." *See* 15 U. S.C. § 1681(a)(4).

10.     The FCRA also requires furnishers of information, a creditor or other third party that provides information about consumer to a CRA, upon notice, to conduct a reasonable reinvestigation of all disputes with regard to the completeness or accuracy of any information it provides to the CRAs regarding a consumer and modify, delete, or permanently block any items of information found to be inaccurate, incomplete, or unverifiable after said reinvestigation is completed.

11.     Plaintiffs' claims arise out of the Credit Bureau Defendants' blatantly inaccurate credit reporting, wherein the Credit Bureau Defendants reported to Plaintiffs' potential creditors that Plaintiffs had failed to make timely payment on their mortgage obligation during one or more months in about the past two years.

12.     Accordingly, Plaintiffs bring claims against the Credit Bureau Defendants for failing to follow reasonable procedures to assure the maximum possible accuracy of Plaintiffs' credit reports, in violation of the FCRA, 15 U.S.C. § 1681e(b), and failing to conduct a reasonable reinvestigation to determine whether information Plaintiffs disputed was inaccurate and record the current status of the disputed information, or delete the disputed information from Plaintiffs' credit file, in violation of the FCRA, 15 U.S.C. § 1681i.

13.     Plaintiffs also bring a claim against Defendant Carrington for failing to fully and properly reinvestigate Plaintiffs' disputes and review all relevant information provided by Plaintiffs and the Credit Bureau Defendants, in violation of the FCRA, 15 U.S.C. § 1681s-2(b)(1).

14.     As part of this action, Plaintiffs seek actual, statutory, and punitive damages, costs and attorneys' fees from Defendants for their willful and/or negligent violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq*., as described herein.

## PARTIES

15.     Seth Cohen ("Plaintiff Seth") is a natural person residing in New York, New York, and is a "consumer" as that term is defined in 15 U.S.C. § 1681a(c).

16.     Pamela Cohen ("Plaintiff Pamela") is a natural person residing in New York, New York, and is a "consumer" as that term is defined in 15 U.S.C. § 1681a(c).

17.     Defendant Equifax Information Services, LLC. ("Defendant Equifax" or "Equifax") is a limited liability company with a principal place of business located at 1550 Peachtree Street, N.W., Atlanta, Georgia 30309, and is authorized to do business in the State of New York, including within this District.

18.     Equifax is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Equifax is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

19.     Defendant Experian Information Solutions, Inc. ("Defendant Experian" or "Experian") is a corporation with a principal place of business located at 701 Experian Pkwy, Allen, Texas 75013, and is authorized to do business in the State of New York, including within this District.

20.     Experian is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Experian is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d), to third parties.

21.     Defendant Trans Union, LLC ("Defendant Trans Union" or "Trans Union") is a limited liability company with a principal place of business located at 2 Baldwin Place, Chester, PA 19022, and is authorized to do business in the State of New York, including within this District.

22.     Trans Union is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Trans Union is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

23.     Carrington Mortgage Services, LLC ("Defendant Carrington" or Carrington") is a national bank with its headquarters located at 1600 South Douglass Road, Suites 110 & 200-A, Anaheim, CA 92806 and is authorized to do business in the State of New York, including within this District.

24.     Carrington is a credit grantor and "furnisher" of consumer information, as defined in 15 U.S.C. § 1681s-2(b).

## JURISDICTION AND VENUE

25.     This Court has jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p, which allows claims under the FCRA to be brought in any appropriate court of competent jurisdiction.

26.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

## FACTS

**A.     SUMMARY OF THE FAIR CREDIT REPORTING ACT**

27.     The FCRA governs the conduct of consumer reporting agencies in an effort to preserve the integrity of the consumer banking system and to protect the rights of consumers to fairness and accuracy in the reporting of their credit information.

28.     The FCRA was designed to protect consumers from the harmful effects of inaccurate information reported in consumer reports (commonly referred to as "credit reports"). Thus, Congress enshrined the principles of "fair and accurate credit reporting" and the "need to ensure that consumer reporting agencies exercise their grave responsibilities with fairness" in the very first provision of the FCRA. *See* 15 U.S.C. § 1681(a).

29.     Specifically, the statute was intended to ensure that "consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information. *See* 15 U.S.C. § 1681(b).

30.     To that end, the FCRA imposes the following twin duties on consumer reporting agencies: (i) consumer reporting agencies must devise and implement reasonable procedures to ensure the "maximum possible accuracy" of information contained in consumer reports (15 U.S.C. § 1681e(b)); and (ii) consumer reporting agencies must reinvestigate the facts and circumstances surrounding a consumer's dispute and timely correct any inaccuracies (15 U.S.C. § 1681i).

31.     The FCRA provides consumers with a private right of action against consumer reporting agencies that willfully or negligently fail to comply with their statutory obligations under the FCRA.

**B.      FACTUAL BACKGROUND**

32.      The United States Congress has found that the banking system is dependent upon fair and accurate credit reporting.  Inaccurate consumer reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence, which is essential to the continual functioning of the banking system.

33.      The Credit Bureau Defendants sell millions of consumer reports (often called "credit reports" or "reports") per day, and also sell credit scores.

34.      Pursuant to 15 U.S.C. § 1681e(b), consumer reporting agencies, like the Credit Bureau Defendants, are required "to follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

35.      Pursuant to 15 U.S.C. §§ 1681b and 1681e(a), consumer reporting agencies, like the Credit Bureau Defendants, must maintain reasonable procedures to assure that consumer reports are sold only for legitimate "permissible purposes."

36.      The Credit Bureau Defendants' consumer reports generally contain the following information:

> (a)      Header/Identifying Information: this section generally includes the consumer's name, current and prior addresses, date of birth, and phone numbers;
>
> (b)      Tradeline Information: this section pertains to consumer credit history, and includes the type of credit account, credit limit or loan amount, account balance, payment history, and status;
>
> (c)      Public Record Information: this section typically includes public record information, such as bankruptcy filings; and,

8

(d)    Credit Inquiries: this section lists every entity that has accessed the consumer's file through a "hard inquiry" (i.e., consumer-initiated activities, such as applications for credit cards, to rent an apartment, to open a deposit account, or for other services) or "soft inquiry" (i.e., user-initiated inquiries like prescreening).

37.    The Credit Bureau Defendants obtain consumer information from various sources. Some consumer information is sent directly to the CRA by furnishers.

38.    The majority of institutions that offer financial services (e.g., banks, creditors, and lenders) rely upon consumer reports from CRAs (like the Credit Bureau Defendants) to make lending decisions.

39.    Those institutions also use FICO Scores, and other proprietary third-party algorithms (or "scoring" models), including debt-to-income ratios, to interpret the information in a consumer's consumer report, which is based on the amount of reported debt, payment history, and date of delinquencies contained in the Credit Bureau Defendants' consumer reports.

40.    The information the Credit Bureau Defendants include in a consumer report contributes to a consumer's overall creditworthiness and determines their FICO Scores.

41.    FICO Scores are calculated using information contained in the Credit Bureau Defendants' consumer reports.

42.    The Credit Bureau Defendants know that FICO and other third-party algorithms (as well as the algorithms owned by the Credit Bureau Defendants) use variables or "attributes" derived from a consumer's consumer report to calculate a "credit score," which is a direct reflection of a consumer's creditworthiness.

43.    The Credit Bureau Defendants know that lenders also consider a consumer's debt-to-income ratio (DTI) before deciding to extend credit or approve financing terms.

44.    DTI compares the total amount a consumer owes to the total amount a consumer earns.

45.    The higher the amount of reported debt that a consumer has, or appears to have, or is rather *reported* to have, the less favorable the consumer's DTI will be, and the more difficult it will be for a consumer to obtain credit and favorable credit terms. Rather, if offered credit at all, consumers will be offered less credit and at higher interest rates.

46.    The Credit Bureau Defendants routinely report inaccurate and materially misleading information about consumers, like Plaintiffs, without verifying or updating it as required by Section 1681e(b) of the FCRA.

47.    The Credit Bureau Defendants fail to employ reasonable procedures to assure the maximum possible accuracy of the information that they report about consumers, including but not limited to, account balances, account statuses, payment histories, and payment statuses.

48.    Consumers have filed thousands of lawsuits and FTC and Consumer Financial Protection Bureau Complaints against the Credit Bureau Defendants for their inaccurate credit reporting.

49.    Thus, the Credit Bureau Defendants are on continued notice of their respective inadequate reporting procedures.  Specifically, the Credit Bureau Defendants are on notice that their inadequate procedures regularly result in the reporting of inaccurate balances, account statuses, payment histories, and payment statuses.

50.     The Credit Bureau Defendants have received and documented many disputes from consumers complaining that Credit Bureau Defendants reported inaccurate information about them.

## C.     PLAINTIFFS ENTER INTO MORTGAGE PAYMENT FORBEARANCE AND REPAYMENT PLAN

51.     Plaintiffs are married and jointly responsible for their mortgage account which was originally held with LoanCare.

52.     From March 1, 2021 through August 31, 2022, Plaintiffs were in forbearance on their mortgage account.

53.     This is confirmed through multiple letters indicating Plaintiffs' mortgage was to continue in its forbearance spanning from March 1, 2021, through August 31, 2022. These letters were dated February 1, 2021, July 9, 2021, October 13, 2021, November 24, 2021, March 10, 2022, and June 2, 2022.

54.     On October 12, 2022, Plaintiffs received a letter from LoanCare detailing a mortgage modification offer.

55.     Plaintiffs accepted the mortgage modification offer and began their trial payments period, as instructed, on December 1, 2022.

56.     Plaintiffs made the modified loan payments, each month and ongoing since December 2022, in a timely and diligent manner.

57.     During the time that Plaintiffs' mortgage was being serviced by LoanCare, no derogatory information was furnished to the Credit Bureau Defendants in relation to their mortgage account.

58.     On May 8, 2023, Plaintiffs received a letter from Carrington stating that Plaintiffs'
mortgage was being transferred to a new servicer — Carrington — effective on May 1, 2023. It
further stated that LoanCare would stop accepting payments from Plaintiffs as of April 30, 2023.

59.     Plaintiffs began making their monthly payments to Carrington, pursuant to the loan
modification trial period plan, on May 5, 2023.

## D.     DEFENDANTS REPORT THAT PLAINTIFFS ARE DELINQUENT ON ONE OR MORE PAYMENT OBLIGATIONS

60.     Sometime after entering into the repayment plan, in or around August 2023,
Carrington began furnishing to the Credit Bureau Defendants information which indicated that
Plaintiffs' mortgage account was 180 days late for the month of August 2023.

61.     Upon review of their credit reports, Plaintiffs were surprised, confused, and
dumbfounded by the delinquent and inaccurate Carrington reporting, as they took their credit
health seriously and were concerned about any negative impact to their credit score and credit
worthiness.

62.     Plaintiff had generally worked hard to maintain a robust and very favorable credit
score and credit history, and their efforts in that regard were successful, in that their credit scores
were extremely favorable and positive.

63.     But Carrington's inaccurate reporting of the mortgage account was devastating to
their credit scores.

64.     In particular, Defendant Carrington reported to the Credit Bureau Defendants that
Plaintiff was 180-days late in relation to the August 2023 monthly payment obligation.

65.     The Credit Bureau Defendants reported to Plaintiffs' credit file and in consumer
reports that Plaintiffs were each 180-days late, for the month of August 2023, for their payment
obligation to Defendant Carrington.

66.     Plaintiffs were confused and distressed by this information because the mortgage account had been in forbearance, therefore requiring no payments, and thereafter Plaintiffs fully complied with their loan modification trial period. Therefore, Carrington should not have been reporting a delinquency on the subject mortgage account.

67.     It was inaccurate to indicate that Plaintiffs had been late on making mortgage payments during any months in the years 2021 through 2023, because Plaintiffs had never been late on their mortgage loan during those months.

68.     Further, it was inaccurate to indicate that Plaintiffs had been late in August 2023, or at any time during 2023, because Plaintiffs had been making timely, monthly payments each month during 2023, exactly as instructed to do by their mortgage servicer.

69.     Defendant Carrington also reported to the Credit Bureau Defendants that Plaintiffs maintained a past due and outstanding balance of $46,086 as of August 2023, which reported balance was highly inflated and flatly untrue and inaccurate, in that it completely failed to account for any of the modified loan payments that Plaintiffs had been making monthly since December 2022.

70.     The Credit Bureau Defendants reported to Plaintiffs' credit file and in consumer reports that Plaintiffs maintained a past due and outstanding balance of $46,086 as of August 2023, which reported balance was highly inflated and inaccurate, in that it completely failed to account for any of the modified loan payments that Plaintiffs had been making monthly since December 2022.

71.     Plaintiffs attempted to resolve the inaccurate delinquency reported directly with Carrington, and LoanCare, and Carrington again, but without success.

72.     Plaintiffs spent hours communicating with LoanCare and Carrington, in an attempt to resolve the inaccurate reporting.

73.     Early on, Carrington suggested it was an issue of paperwork – that LoanCare had not yet provided all the documentation necessary for it to accurately determine the amount owed or paid by Plaintiffs, including in relation to any loan modification.

74.     In September 2023, Plaintiffs Pamela and Seth filed a Consumer Financial Protection Bureau (CFPB) Complaint against Defendant Carrington and LoanCare stating that they were offered general terms of a mortgage modification from LoanCare with a new monthly payment. Plaintiffs stated that they accepted these terms and began making their trial period payments on December 1, 2022, and have continued to pay the monthly amounts as instructed. Plaintiffs further stated that Carrington insisted they had never received the loan modification paperwork from LoanCare, while LoanCare was stating that all such documentation was provided to Carrington. Plaintiffs proceeded to explicate the harm they sustained as their credit scores have decreased over 100 points, and upon information and belief over 150 points, due to their inaccurately perceived combined incompetence.

75.     Plaintiffs also attached with their CFPB complaint documentation evidencing the inaccuracy of the 180-delinquency regarding their mortgage account.

76.     On October 13, 2023, LoanCare responded to Plaintiff Seth's Complaint and assured him that Carrington had all the documents evidencing the loan modification in its possession, and that it was Carrington's responsibility to service the account and report accurate information to the bureaus.

77.     In its letter, LoanCare specifically clarified that Carrington had been fully apprised about the loan modification terms, explaining:

We also provided the calculations allied with the modification review and advised them of what we believed should be the modified terms. We confirmed with Carrington Mortgage Servicing on October 10, 2023, that they received all information.

78.     On October 25, 2023, Defendant Carrington responded to Plaintiff Seth's and Plaintiff Pamela's CFPB Complaint, but continued to furnish to the Credit Bureau Defendants the inaccurate information of a 180-day delinquency on Plaintiffs' mortgage account for the month of August 2023 and an inaccurate and highly inflated and untrue outstanding balance due, despite being on notice of the inaccuracy of such a reporting.

**E.     PLAINTIFF SETH'S DISPUTES**

      **a.     Plaintiff Seth's September 2023 Dispute to the Credit Bureau Defendants Regarding the Inaccurate Credit Reporting**

79.     In or about September 2023, extremely shocked, surprised, and embarrassed at the Defendants' inaccurate reporting, Plaintiff Seth disputed the 180-day late notation associated with his mortgage account by Defendant Carrington with each of the Credit Bureau Defendants.

80.     Plaintiff Seth explained that any notation that he was 180-days late in August 2023 in relation to his mortgage account with Defendant Carrington was inaccurate, and he further explained that he had been making timely monthly payments on his mortgage in the amounts due and was never late.

81.     Plaintiff Seth requested that each of Equifax, Experian, and Trans Union reinvestigate the disputed information, correct the reporting, and for each to send him a corrected copy of his credit report.

**b.      Defendant Equifax's Unreasonable Dispute Reinvestigation**

82.      Upon information and belief, Equifax sent Defendant Carrington an automated credit dispute verification ("ACDV") pursuant to Plaintiff Seth's September 2023 dispute to Equifax.

83.      Upon information and belief, Defendant Equifax failed to adequately review all of the information provided to it by Plaintiff Seth in support of Plaintiff Seth's dispute.

84.      Specifically, on September 29, 2023, Defendant Equifax responded to Plaintiff Seth's dispute stating that it will continue reporting the derogatory account with a status of over 120 days past due, and an outstanding balance of $46,086.00.

85.      Defendant Equifax failed to conduct a reasonable reinvestigation of Plaintiff Seth's September 2023 dispute.

86.      Thereafter, Defendant Equifax failed to correct or delete the late notation appearing in Plaintiff Seth's credit file.

87.      Equifax either failed to conduct a reasonable reinvestigation of Plaintiff Seth's dispute tendered in September 2023, or failed to conduct any reinvestigation whatsoever, to determine whether the disputed information is inaccurate and record the current status of the disputed information, in violation of 15 U.S.C. § 1681i(a)(1)(A).

**c.      Defendant Experian's Unreasonable Dispute Reinvestigation**

88.      Upon information and belief, Experian sent Defendant Carrington an automated credit dispute verification ("ACDV") pursuant to Plaintiff Seth's September 2023 dispute to Experian.

89.      Upon information and belief, Defendant Experian failed to adequately review all of the information provided to it by Plaintiff Seth in support of Plaintiff Seth's dispute.

90.     Specifically, on October 3, 2023, Defendant Experian responded to Plaintiff Seth indicating that Defendant Experian would continue to report the 180-day late notation for August 2023, and an outstanding balance of $46,086.00.

91.     Defendant Experian failed to conduct a reasonable reinvestigation of Plaintiff Seth's September 2023 dispute.

92.     Thereafter, Defendant Experian failed to correct or delete the 180-day late notation appearing in Plaintiff Seth's credit file.

93.     Experian either failed to conduct a reasonable reinvestigation of Plaintiff Seth's dispute tendered in September 2023, or failed to conduct any reinvestigation whatsoever, to determine whether the disputed information is inaccurate and record the current status of the disputed information, in violation of 15 U.S.C. § 1681i(a)(1)(A).

> ### d.     Defendant Trans Union's Unreasonable Dispute Reinvestigation

94.     Upon information and belief, Trans Union sent Defendant Carrington an automated credit dispute verification ("ACDV") pursuant to Plaintiff Seth's September 2023, dispute to Trans Union.

95.     Upon information and belief, Defendant Trans Union failed to adequately review all of the information provided to it by Plaintiff Seth in support of Plaintiff Seth's dispute.

96.     Specifically, on September 29, 2023, Defendant Trans issued a dispute response indicating that it would continue reporting the over 120-day late notation, with a past due balance of $46,086.00, relating to Plaintiff Seth's mortgage account with Defendant Carrington.

97.     Upon information and belief, Defendant Trans Union failed to conduct a reasonable reinvestigation of Plaintiff Seth's September 2023 dispute.

98.     Thereafter, Defendant Trans Union failed to correct or delete the mortgage account delinquency notation appearing in Plaintiff Seth's credit file.

99.     Trans Union failed to conduct a reasonable reinvestigation of Plaintiffs' dispute tendered in September 2023, or any reinvestigation whatsoever, to determine whether the disputed information is inaccurate and record the current status of the disputed information, in violation of 15 U.S.C. § 1681i(a)(1)(A).

      **e.**    **The Credit Bureau Defendants' Method for Considering Consumer Credit Report Disputes**

100.    The credit industry has constructed a method of numeric-alpha codes for considering consumer credit report disputes. See 15 U.S.C. § 1681i(a)(5)(D).

101.    The credit bureaus, Equifax, Experian, Trans Union, and Innovis, have thus created the Online Solution for Complete and Accurate Reporting, or e-OSCAR, as the credit industries' standard of performance. e-OSCAR allows the credit bureaus to create and data furnishers to respond to disputes initiated by consumers by routing credit reporting agency-created prompts for automated consumer dispute verifications to the appropriate data furnishers. e-OSCAR utilizes a numeric-alpha language specific to the credit reporting industry.

102.    That lexicon or unique language is commonly referred to in the credit reporting industry as "Metro 2 Format" or "Metro 2."

103.    It is also known industry wide as the CDIA's "Credit Reporting Resource Guide."

104.    Metro 2 is driven by numeric codes that translate into specific alpha representations about consumers' creditworthiness and character that will ultimately appear on credit reports issued to third parties who make credit, insurance, rental, and employment decisions regarding consumers.

105.    Metro 2 codes are used on an industry wide form known within the credit industry as an Automated Consumer Dispute Verification ("ACDV") electronic form.

106.    The ACDVs have many fields in their body for use in effecting thorough and complete communications between data furnishers and the credit reporting agencies.

107.    These ACDV "fields" have various titles for the many substantive areas into which the Metro 2 codes can be entered.

108.    Upon receiving a dispute from a consumer, the credit bureaus have an automated system that prepares ACDVs that are sent to each of the data furnishers that are reporting the credit accounts disputed by a consumer.

109.    The data furnishers, like Defendant Carrington, then have an obligation under the FCRA to conduct a reasonable reinvestigation with respect to the disputed credit account and review all relevant information provided by the consumer with the dispute to determine whether the disputed credit account information is accurate and/or belongs to the disputing consumer. See 15 U.S.C. § 1681s-2(b).

110.    Once the data furnisher completes its reinvestigation, it will code the ACDV accordingly, representing either that the disputed account was verified as accurate and belonging to the disputing consumer, updating information related to the account, or deleting the account entirely, and return the ACDV to the respective credit bureau(s) via e-OSCAR.

**f.    Defendant Carrington's Unreasonable Dispute Reinvestigation**

111.    Upon information and belief, in or about September 2023, Defendant Carrington received Defendant Equifax's ACDV and failed to conduct a reasonable investigation with respect to the information disputed by Plaintiff Seth.

112.    Upon information and belief, Defendant Carrington failed to review all relevant information provided by Defendant Equifax regarding Plaintiff Seth's dispute tendered in or about September 2023.

113.    Upon information and belief, Defendant Carrington verified the disputed information as accurate to Defendant Equifax in or about September 29, 2023.

114.    Upon information and belief, in or about September 2023, Defendant Carrington received Defendant Experian's ACDV and failed to conduct a reasonable investigation with respect to the information disputed by Plaintiff Seth.

115.    Upon information and belief, Defendant Carrington failed to review all relevant information provided by Defendant Experian regarding Plaintiff Seth's dispute tendered in or about September 2023.

116.    Upon information and belief, in or about October 3, 2023, Defendant Carrington verified the disputed information as accurate to Defendant Experian.

117.    Upon information and belief, in or about September 2023, Defendant Carrington received Defendant Trans Union's ACDV and failed to conduct a reasonable investigation with respect to the information disputed by Plaintiff Seth.

118.    Upon information and belief, Defendant Carrington failed to review all relevant information provided by Defendant Trans Union regarding Plaintiff Seth's dispute tendered in or about September 2023.

119.    Upon information and belief, in or about September 29, 2023, Defendant Carrington verified the disputed information as accurate to Defendant Trans Union.

120.    Defendant Carrington violated 15 U.S.C. § 1681s-2b by failing to conduct a reasonable investigation with respect to the disputed information, failing to review all relevant

information available to it, and failing to modify, delete, or permanently block the disputed information that was inaccurate, incomplete, or unverifiable.

      **g.**    **Plaintiff Seth's November 2023 Dispute to the Credit Bureau Defendants Regarding the Inaccurate Credit Reporting**

121.    As of October 16, 2023, Defendant Equifax was reporting that Plaintiff Seth was over 120-days late on his mortgage payment obligation to Defendant Carrington for the month of August 2023, and a past-due balance of $46,086,00.

122.    As of October 16, 2023, Defendant Experian was reporting that Plaintiff Seth was 180-days late on his mortgage payment obligation to Defendant Carrington for the month of August 2023, and a past-due balance of $46,086,00.

123.    As of October 16, 2023, Defendant Trans Union was reporting that Plaintiff Seth was over 120-days late on his mortgage payment obligation to Defendant Carrington for the month of August 2023, and a past-due balance of $46,086,00.

124.    Accordingly, on November 6, 2023, Plaintiff Seth sent a letter to LoanCare and Carrington stating that the reportedly past due amount of $46,086,00 is inaccurate, as Plaintiff Seth made timely payments of $1,850.69 every month. Plaintiff further disputed escrow and fee errors. Plaintiff Seth requested a complete loan history breakdown in an understandable format and provided his personal identifying information and contact information. This letter was dated November 3, 2023.

125.    In early November 2023, frustrated by the lack of responsiveness by any of the Defendants and each of them giving him the run-around while trashing his credit without any factual or accurate basis, Plaintiff Seth disputed the inaccurate late notation and inaccurate outstanding balance associated with his mortgage with each of the Credit Bureau Defendants. This dispute letter, addressed to each of the Credit Bureau Defendants, was dated November 3, 2023.

126.    In his dispute letter to each of the Credit Bureau Defendants, Plaintiff Seth explained that any notation that he was late in August 2023 in relation to his mortgage with Defendant Carrington was inaccurate, and that he had made timely monthly payments exactly as instructed by his mortgage servicer, each month, and was never late.

127.    Plaintiff Seth requested that Equifax, Experian, and Trans Union reinvestigate the disputed information, correct the reporting, and for each to send him a corrected copy of his credit report.

128.    Enclosed with his dispute letter to each of the Credit Bureau Defendants was account statements and bank statements reflecting each of the monthly payments that Plaintiff had made on the mortgage to his mortgage servicer, dating back to December 2022, along with a copy of government-issued photo identification, and identifying information such as a date of birth, address, and last four digits of his social security number.

### h.    Defendant Equifax's Unreasonable Reinvestigation

129.    Upon information and belief, Defendant Equifax sent Defendant Carrington an automated credit dispute verification ("ACDV") pursuant to Plaintiff Seth's November 2023, dispute to Defendant Equifax.

130.    Upon information and belief, Defendant Equifax failed to adequately review all of the information provided to it by Plaintiff Seth in support of Plaintiff Seth's dispute.

131.    Specifically, Plaintiff Seth did not receive a dispute response from Defendant Equifax.

132.    Indeed, as of February 6, 2024, Defendant Equifax had partially corrected its reporting, but still continued to indicate that the mortgage account with Defendant Carrington was "180-days or more past due" in May 2023 with an amount past due, in May 2023, of $46,086.

133.    Upon information and belief, Defendant Equifax failed to conduct a reasonable reinvestigation of Plaintiff Seth's November 2023 dispute.

134.    Defendant Equifax failed to conduct a reasonable reinvestigation of Plaintiff Seth's dispute tendered in November 2023 to determine whether the disputed information is inaccurate and record the current status of the disputed information, in violation of 15 U.S.C. § 1681i(a)(1)(A).

### i.    Defendant Experian's Unreasonable Reinvestigation

135.    Defendant Experian failed to adequately review all of the information provided to it by Plaintiff Seth in support of Plaintiff Seth's dispute.

136.    Defendant Experian failed, and flatly refused, to conduct a reasonable reinvestigation of Plaintiff Seth's November 2023 dispute.

137.    Instead on reinvestigating, Experian sent a letter to Plaintiff Seth dated November 15, 2023, indicating that it had insufficient information with which to verify that the dispute was "sent directly" by Plaintiff Seth.

138.    Upon information and belief, Experian's procedures permit it to disregard a consumer's mailed credit dispute on the basis of a suspicion that the mail did not originate with the consumer even without opening the sealed envelope to determine which forms of identification, if any, were included in the mailed dispute envelope; this procedure is unreasonable.

139.    Thereafter, Defendant Experian failed to correct or delete the 180-day late notation appearing in Plaintiff Seth's credit file relating to his mortgage account with Defendant Carrington.

140.    Defendant Experian failed to conduct a reasonable reinvestigation of Plaintiff Seth's November 2023 dispute, or any reinvestigation whatsoever, to determine whether the

disputed information is inaccurate and record the current status of the disputed information, in violation of 15 U.S.C. § 1681i(a)(1)(A).

### j.     Defendant Trans Union's Correction of the Inaccurate Reporting

141.    Defendant Trans Union appears to have corrected the inaccurate late payment and balance owed reporting, on or before February 6, 2024.

### k.     Defendant Carrington's Unreasonable Dispute Reinvestigation

142.    Upon information and belief, in or about November 2023, Defendant Carrington received Defendant Equifax's ACDV and failed to conduct a reasonable investigation with respect to the information disputed by Plaintiff Seth.

143.    Upon information and belief, Defendant Carrington failed to review all relevant information provided by Defendant Equifax regarding Plaintiff Seth's November 2023 dispute.

144.    Upon information and belief, in or about November 2023, Defendant Carrington verified the disputed information as accurate to Defendant Equifax.

145.    Upon information and belief, in or about November 2023, Defendant Carrington received Defendant Trans Union's ACDV and failed to conduct a reasonable investigation with respect to the information disputed by Plaintiff Seth.

146.    Upon information and belief, Defendant Carrington failed to review all relevant information provided by Defendant Trans Union regarding Plaintiff Seth's November 2023 dispute.

147.    Upon information and belief, in or about November 2023, Defendant Carrington verified the disputed information as accurate to Defendant Trans Union.

148.    Defendant Carrington violated 15 U.S.C. § 1681s-2b by failing to conduct a reasonable investigation with respect to the disputed information, failing to review all relevant

information available to it, and failing to modify, delete, or permanently block the disputed information that was inaccurate, incomplete or unverifiable.

### l.   Plaintiff Seth's December 2023 Dispute to Defendant Experian Regarding the Inaccurate Credit Reporting

149.   As of December 4, 2023, Defendant Experian continued to report that Plaintiff Seth was 180-days late on his mortgage payment obligation to Defendant Carrington for the month of August 2023.

150.   Accordingly, on or about December 4, 2023, exasperated by Experian and Carrington's stubborn recalcitrance, Plaintiff Seth disputed the 180-day late notation associated with his Carrington mortgage with Defendant Experian, again.

151.   Plaintiff Seth explained that any notation that he was 180-days late in August 2023 in relation to his mortgage with Defendant Carrington was inaccurate.

152.   In his dispute letter to Experian, Plaintiff Seth once again explained that any notation that he was late in August 2023 in relation to his mortgage with Defendant Carrington was inaccurate, and that he had made timely monthly payments exactly as instructed by his mortgage servicer, each month, and was never late.

153.   Plaintiff Seth requested that Experian reinvestigate the disputed information, correct the reporting, and send him a corrected copy of his credit report.

154.   Enclosed with his dispute letter was account statements and bank statements reflecting each of the monthly payments that Plaintiff had made on the mortgage to his mortgage servicer, dating back to December 2022, along with a copy of government-issued photo identification, and identifying information such as a date of birth, address, and last four digits of his social security number.

### m.   Defendant Experian's Correction of the Inaccurate Reporting

155.   On January 4, 2024, Plaintiff received a dispute response from Defendant Experian wherein it updated Plaintiff Seth's credit report and removed the 180-day late notation of Plaintiffs' mortgage account with Defendant Carrington, finally reporting the account accurately, as current.

## F.   PLAINTIFF PAMELA'S DISPUTES

### a.   Plaintiff Pamela's September/October 2023 Dispute to the Credit Bureau Defendants Regarding the Inaccurate Credit Reporting

156.   In or about September or October of 2023, extremely shocked, surprised, and embarrassed at the Credit Bureau Defendants' inaccurate reporting, Plaintiff Pamela disputed the 180-day late notation associated with her mortgage account with Defendant Carrington with each of the Credit Bureau Defendants.

157.   Plaintiff Pamela explained that any notation that she was 180-days late in August 2023 in relation to her mortgage account with Defendant Carrington was inaccurate, and she further explained that she had been making timely monthly payments on her mortgage in the amounts due and was never late.

158.   Plaintiff Pamela requested that each of Equifax, Experian, and Trans Union reinvestigate the disputed information, correct the reporting, and for each to send her a corrected copy of her credit report.

### b.   Defendant Equifax's Unreasonable Dispute Reinvestigation

159.   Upon information and belief, Equifax sent Defendant Carrington an automated credit dispute verification ("ACDV") pursuant to Plaintiff Pamela's September or October of 2023 dispute to Equifax.

160.    Upon information and belief, Defendant Equifax failed to adequately review all of the information provided to it by Plaintiff Pamela in support of Plaintiff Pamela's dispute.

161.    Specifically, on October 12, 2023, Defendant Equifax responded to Plaintiff Pamela's dispute indicating that it would continue reporting the derogatory account with a status of over 120 days past due, and an outstanding balance of $46,086.00.

162.    Defendant Equifax failed to conduct a reasonable reinvestigation of Plaintiff Pamela's September or October of 2023 dispute.

163.    Thereafter, Defendant Equifax failed to correct or delete the late notation appearing in Plaintiff Pamela's credit file.

164.    Equifax failed to conduct a reasonable reinvestigation of Plaintiff Pamela's dispute tendered in or around September or October of 2023, or any reinvestigation whatsoever, to determine whether the disputed information is inaccurate and record the current status of the disputed information, in violation of 15 U.S.C. § 1681i(a)(1)(A).

### c.    Defendant Experian's Unreasonable Dispute Reinvestigation

165.    Upon information and belief, Experian sent Defendant Carrington an automated credit dispute verification ("ACDV") pursuant to Plaintiff Pamela's September or October of 2023 dispute to Experian.

166.    Upon information and belief, Defendant Experian failed to adequately review all of the information provided to it by Plaintiff Pamela in support of Plaintiff Pamela's dispute.

167.    Specifically, on October 16, 2023, Defendant Experian responded to Plaintiff Pamela indicating that it would continue reporting the 180-day late payment notation and past due balance of $46,086.

168.    Upon information and belief, Defendant Experian failed to conduct a reasonable reinvestigation of Plaintiff Pamela's September or October of 2023 dispute.

169.    Thereafter, Defendant Experian failed to correct or delete the 180-day late notation appearing in Plaintiff Pamela's credit file.

170.    Experian failed to conduct a reasonable reinvestigation of Plaintiff Pamela's dispute tendered in or around September or October of 2023, or any reinvestigation whatsoever, to determine whether the disputed information is inaccurate and record the current status of the disputed information, in violation of 15 U.S.C. § 1681i(a)(1)(A).

**d.    Defendant Trans Union's Unreasonable Dispute Reinvestigation**

171.    Upon information and belief, Trans Union sent Defendant Carrington an automated credit dispute verification ("ACDV") pursuant to Plaintiff Pamela's September or October of 2023 dispute to Trans Union.

172.    Upon information and belief, Defendant Trans Union failed to adequately review all of the information provided to it by Plaintiff Pamela in support of Plaintiff Pamela's dispute.

173.    Specifically, on October 12, 2023, Defendant Trans Union issued a dispute response indicating that it would continue reporting the over 120 day-late notation, with a past due balance of $46,086.00, relating to Plaintiff Pamela's mortgage account with Defendant Carrington.

174.    Defendant Trans Union failed to conduct a reasonable reinvestigation of Plaintiff Pamela's September or October of 2023 dispute.

175.    Thereafter, Defendant Trans Union failed to correct or delete the mortgage account delinquency notation appearing in Plaintiff Pamela's credit file.

176.    Trans Union failed to conduct a reasonable reinvestigation of Plaintiff Pamela's dispute tendered in September or October of 2023 to determine whether the disputed information

is inaccurate and record the current status of the disputed information, in violation of 15 U.S.C. § 1681i(a)(1)(A).

### e.      Defendant Carrington's Unreasonable Dispute Reinvestigation

177.    Upon information and belief, in or about September or October of 2023, Defendant Carrington received Defendant Equifax's ACDV and failed to conduct a reasonable investigation with respect to the information disputed by Plaintiff Pemela.

178.    Upon information and belief, Defendant Carrington failed to review all relevant information provided by Defendant Equifax regarding Plaintiff Pamela's dispute tendered in or about September or October of 2023.

179.    Upon information and belief, Defendant Carrington verified the disputed information as accurate to Defendant Equifax in or about October 12, 2023.

180.    Upon information and belief, in or about September or October of 2023, Defendant Carrington received Defendant Experian's ACDV and failed to conduct a reasonable investigation with respect to the information disputed by Plaintiff Pamela.

181.    Upon information and belief, Defendant Carrington failed to review all relevant information provided by Defendant Experian regarding Plaintiff Pamela's dispute tendered in or about September or October of 2023.

182.    Upon information and belief, in or about October 16, 2023, Defendant Carrington verified the disputed information as accurate to Defendant Experian.

183.    Upon information and belief, in or about September 2023, Defendant Carrington received Defendant Trans Union's ACDV and failed to conduct a reasonable investigation with respect to the information disputed by Plaintiff Pamela.

184. Upon information and belief, Defendant Carrington failed to review all relevant information provided by Defendant Trans Union regarding Plaintiff Pamela's dispute tendered in or about September or October of 2023.

185. Upon information and belief, in or about October 12, 2023, Defendant Carrington verified the disputed information as accurate to Defendant Trans Union.

186. Defendant Carrington violated 15 U.S.C. § 1681s-2b by failing to conduct a reasonable investigation with respect to the disputed information, failing to review all relevant information available to it, and failing to modify, delete, or permanently block the disputed information that was inaccurate, incomplete or unverifiable.

      **f.     Plaintiff Pamela's November 2023 Dispute to the Credit Bureau Defendants Regarding the Inaccurate Credit Reporting**

187. As of October 16, 2023, Defendant Equifax was reporting that Plaintiff Pamela was over 120-days late on her mortgage payment obligation to Defendant Carrington for the month of August 2023.

188. As of October 16, 2023, Defendant Experian was reporting that Plaintiff Pamela was 180-days late on her mortgage payment obligation to Defendant Carrington for the month of August 2023.

189. As of October 16, 2023, Defendant Trans Union was reporting that Plaintiff Pamela was over 120-days late on her mortgage payment obligation to Defendant Carrington for the month of August 2023.

190. Accordingly, on or about November 6, 2023, Plaintiff Pamela sent a letter to LoanCare and Carrington stating that the reportedly past due amount of $46,086,00 is inaccurate, as Plaintiff Pamela made timely payments of $1,850.69 every month. Plaintiff further disputed

escrow and fee errors. Plaintiff Pamela requested a complete loan history breakdown in an understandable format and provided her personal identifying information and contact information.

191.     In early November 2023, frustrated by the lack of responsiveness by any of the Defendants and each of them giving her the run-around while trashing her credit without any factual or accurate basis, Plaintiff Pamela disputed the inaccurate late notation and inaccurate outstanding balance associated with her mortgage with each of the Credit Bureau Defendants. This dispute letter, addressed to each of the Credit Bureau Defendants, was dated November 3, 2023.

192.     In her dispute letter to each of the Credit Bureau Defendants, Plaintiff Pamela explained that any notation that she was late in August 2023 in relation to her mortgage with Defendant Carrington was inaccurate, and that she had made timely monthly payments exactly as instructed by her mortgage servicer, each month, and was never late.

193.     Plaintiff Seth requested that Equifax, Experian, and Trans Union reinvestigate the disputed information, correct the reporting, and for each to send her a corrected copy of her credit report.

194.     Enclosed with her dispute letter to each of the Credit Bureau Defendants was account statements and bank statements reflecting each of the monthly payments that Plaintiff had made on the mortgage to his mortgage servicer, dating back to December 2022, along with a copy of government-issued photo identification, and identifying information such as a date of birth, address, and last four digits of her social security number.

### g.      Defendant Equifax's Unreasonable Reinvestigation

195.     Upon information and belief, Defendant Equifax sent Defendant Carrington an automated credit dispute verification ("ACDV") pursuant to Plaintiff Pamela's November 15, 2023, dispute to Defendant Equifax.

196.     Upon information and belief, Defendant Equifax failed to adequately review all of the information provided to it by Plaintiff Pamela in support of Plaintiff Pamela's dispute.

197.     Specifically, Plaintiff Pamela did not receive a dispute response from Defendant Equifax.

198.     Additionally, as of February 6, 2024, Defendant Equifax partially updated its account reporting, but continued to indicate that Plaintiff Pamela's Carrington mortgage account had a past due amount, in May of 2023, of $46,086.

199.     Upon information and belief, Defendant Equifax failed to conduct a reasonable reinvestigation of Plaintiff Pamela's November 2023 dispute.

200.     Thereafter, Defendant Equifax failed to correct the past due amount notation appearing in Plaintiff Pamela's credit file regarding her mortgage account with Defendant Carrington.

201.     Defendant Equifax failed to conduct a reasonable reinvestigation of Plaintiff Pamela's dispute tendered in November 2023 to determine whether the disputed information is inaccurate and record the current status of the disputed information, in violation of 15 U.S.C. § 1681i(a)(1)(A).

## h.     Defendant Experian's Unreasonable Reinvestigation

202.     Upon information and belief, Defendant Experian failed to adequately review all of the information provided to it by Plaintiff Pamela in support of Plaintiff Pamela's dispute.

203.     Defendant Experian failed, and flatly refused, to conduct a reasonable reinvestigation of Plaintiff Pamela's November 2023 dispute.

204.    Instead on reinvestigating, Experian sent a letter to Plaintiff Pamela dated November 15, 2023, indicating that it had insufficient information with which to verify that the dispute was "sent directly" by Plaintiff Pamela.

205.    Upon information and belief, Experian's procedures permit it to disregard a consumer's mailed credit dispute on the basis of a suspicion that the mail did not originate with the consumer even without opening the sealed envelope to determine which forms of identification, if any, were included in the mailed dispute envelope; this procedure is unreasonable.

206.    Thereafter, Defendant Experian failed to correct or delete the 180-day late notation appearing in Plaintiff Pamela's credit file relating to his mortgage account with Defendant Carrington.

207.    Defendant Experian failed to conduct a reasonable reinvestigation of Plaintiff Pamela's November 2023 dispute, or any reinvestigation whatsoever, to determine whether the disputed information is inaccurate and record the current status of the disputed information, in violation of 15 U.S.C. § 1681i(a)(1)(A).

### i.    Defendant Trans Union Corrected the Inaccurate Credit Reporting

208.    Defendant Trans Union appears to have corrected the inaccurate late payment and balance owed reporting, on or before February 10, 2024.

### j.    Defendant Carrington's Unreasonable Dispute Reinvestigation

209.    Upon information and belief, in or about November 2023, Defendant Carrington received Defendant Equifax's ACDV and failed to conduct a reasonable investigation with respect to the information disputed by Plaintiff Pamela.

210.    Upon information and belief, Defendant Carrington failed to review all relevant information provided by Defendant Equifax regarding Plaintiff Pamela's November 2023 dispute.

211.    Upon information and belief, in response to Plaintiff Pamela's November 2023 dispute, Defendant Carrington verified the disputed information as accurate to Defendant Equifax.

212.    Upon information and belief, in or about November 2023, Defendant Carrington received Defendant Trans Union's ACDV and failed to conduct a reasonable investigation with respect to the information disputed by Plaintiff Pamela.

213.    Upon information and belief, Defendant Carrington failed to review all relevant information provided by Defendant Trans Union regarding Plaintiff Pamela's November 2023 dispute.

214.    Upon information and belief, in response to Plaintiff Pamela's November 2023 dispute, Defendant Carrington verified the disputed information as accurate to Defendant Trans Union.

215.    Defendant Carrington violated 15 U.S.C. § 1681s-2b by failing to conduct a reasonable investigation with respect to the disputed information, failing to review all relevant information available to it, and failing to modify, delete, or permanently block the disputed information that was inaccurate, incomplete or unverifiable.

### k.    Plaintiff Pamela's December 2023 Dispute to Defendant Experian Regarding the Inaccurate Credit Reporting

216.    As of December 4, 2023, Defendant Experian continued to report that Plaintiff Pamela was 180-days late on his mortgage payment obligation to Defendant Carrington for the month of August 2023.

217.    Accordingly, on or about December 4, 2023, disturbed and distressed by Experian and Carrington's stubborn recalcitrance, Plaintiff Pamela disputed the 180-day late notation associated with her Carrington mortgage with Defendant Experian, again.

218.    Plaintiff Pamela explained that any notation that she was 180-days late in August 2023 in relation to her mortgage with Defendant Carrington was inaccurate.

219.    In her dispute letter to Experian, Plaintiff Pamela once again explained that any notation that she was late in August 2023 in relation to her mortgage with Defendant Carrington was inaccurate, and that she had made timely monthly payments exactly as instructed by her mortgage servicer, each month, and was never late.

220.    Plaintiff Pamela requested that Experian reinvestigate the disputed information, correct the reporting, and send her a corrected copy of her credit report.

221.    Enclosed with her dispute letter was account statements and bank statements reflecting each of the monthly payments that Plaintiff had made on the mortgage to her mortgage servicer, dating back to December 2022, along with a copy of government-issued photo identification, and identifying information such as a date of birth, address, and last four digits of her social security number.

### l.    Defendant Experian's Correction of the Inaccurate Reporting

222.    On December 14, 2024, Plaintiff Pamela received a dispute response from Defendant Experian wherein it updated Plaintiff Pamela's credit report and removed the 180-day late notation of Plaintiffs' mortgage account with Defendant Carrington, reporting the account as current.

223.    Plaintiffs reasonably believe that one or more of the Credit Bureau Defendants continued to publish that Plaintiffs were late on a payment obligation owed to Defendant Carrington, at some point between October of 2023 and January 2024.

224.    As a result of the inaccurate late notation, and despite Plaintiffs' forbearance agreement with LoanCare and their tendering payments pursuant to their trial payment period of

their loan modification agreement, the Defendants made it practically impossible for Plaintiffs to continue to obtain credit.

225.   Specifically, on September 13, 2023, less than one month since Defendants' inaccurate reporting for the month of August 2023, Plaintiff Seth received a letter from American Express stating that his American Express "Classic Gold" credit card, which had previously been unlimited in terms of spending limits, had been assigned a spending limit. American Express's letter explained that this spending limit was imposed for the following reason: "Based on your credit report, you are or were past due with another creditor(s)."

226.   American Express identified Experian as the provider of the credit report upon which it based its credit limiting decision.

227.   On September 27, 2023, approximately one month since Defendants' inaccurate reporting for the month of August 2023, Plaintiff Pamela received a letter from American Express stating that her American Express "Optima Platinum" credit card had been summarily canceled.

228.   American Express's cancelation letter explained that the cancelation was based on Plaintiff Pamela's insufficient FICO Score as obtained from Experian, which "[o]n September 14, 2023 . . . was 644."

229.   American Express's cancelation letter further helpfully listed "key factors" that "contributed to [her] FICO Score," including, primarily, a "serious delinquency," and a delinquency that was "too recent."

230.   Upon information and belief, each of Plaintiffs' FICO Scores and other credit scores have suffered significant reductions as a direct result of Defendants' inaccurate and adverse reporting.

231.    Upon information and belief, had Defendants accurately reported the Carrington mortgage account, Plaintiff Pamela's FICO Score would have been sufficient to avoid the consequence of having her American Express credit card canceled.

232.    Plaintiffs had each maintained impeccable credit scores and FICO Scores, until Defendants' reporting utterly destroyed it.

233.    Furthermore, upon information and belief, Plaintiffs were each denied promotional opportunities they otherwise would have been eligible for.

234.    As a result of each of Defendants' conduct, Plaintiffs each suffered significant emotional distress and anxiety, and physical manifestation thereof, including loss of sleep, lack of focus, frequent occurrences of distraction and feelings of irritated, crying, feelings of anger, stress, and of being disordered.

235.    At all times pertinent hereto, Defendants were acting by and through their agents, servants, and/or employees who were acting within the course and scope of their agency or employment, and under the direct supervision and control of the Defendants herein.

236.    At all times pertinent hereto, the conduct of Defendants, as well as that of their respective agents, servants, and/or employees, was intentional, willful, reckless, grossly negligent and in utter disregard for federal law and the rights of the Plaintiffs herein.

237.    As a standard practice, the Credit Bureau Defendants do not conduct independent investigations in response to consumer disputes.  Instead, they merely parrot the response of the credit furnisher despite numerous court decisions admonishing this practice.  *See Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir. 1997) (The 'grave responsibilit[y]' imposed by § 1681i(a) must consist of something more than merely parroting information received from other sources.  Therefore, a 'reinvestigation' that merely shifts the burden back to the consumer and the

credit grantor cannot fulfill the obligations contemplated by the statute."); *Apodaca v. Discover Fin. Servs.*, 417 F. Supp. 2d 1220, 1230-31 (D.N.M. 2006) (noting that credit reporting agencies may not rely on automated procedures that make only superficial inquiries once the consumer has notified it that information is disputed); *Gorman v. Experian Info. Sols., Inc.*, 2008 WL 4934047, at *6 (S.D.N.Y. Nov. 19, 2008).

238.    The Credit Bureau Defendants are aware of the shortcomings of their procedures and intentionally choose not to comply with the FCRA to lower their costs.  Accordingly, the Credit Bureau Defendants' violations of the FCRA are willful.

239.    As a result of Defendants' conduct, action, and inaction, Plaintiffs suffered damage by loss of credit; loss of ability to purchase and benefit from their good credit rating; detriment to their credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

### CLAIMS FOR RELIEF

### COUNT I
### 15 U.S.C. § 1681e(b)
**Failure to Follow Reasonable Procedures to Assure Maximum Possible Accuracy**
**(First Claim for Relief Against Defendants Equifax, Experian, and Trans Union)**

240.    Plaintiffs re-allege and incorporate by reference the allegations set forth in preceding paragraphs as if fully stated herein.

241.    The FCRA imposes a duty on consumer reporting agencies to devise and implement procedures to ensure the "maximum possible accuracy" of consumer reports, as follows:

> Whenever a consumer reporting agency prepares a consumer report, it shall follow reasonable procedures to assure *the maximum possible accuracy* of the information concerning the individual about whom the report relates.

15 U.S.C. §1681e(b) (emphasis added).

242.    On numerous occasions, Defendants Equifax, Experian, and Trans Union prepared patently false consumer reports concerning Plaintiffs.

243.    Defendants Equifax, Experian, and Trans Union readily sold such false reports to one or more third parties, thereby misrepresenting Plaintiffs, and ultimately Plaintiffs' creditworthiness.

244.    Defendant Equifax violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning Plaintiff Seth.

245.    Defendant Experian violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning Plaintiff Seth.

246.    Defendant Trans Union violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning Plaintiff Seth.

247.    Defendant Equifax violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning Plaintiff Pamela.

248.    Defendant Experian violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning Plaintiff Pamela.

249.     Defendant Trans Union violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning Plaintiff Pamela.

250.     As a result of Defendants' Equifax, Experian, and Trans Union conduct, action, and inaction, Plaintiffs suffered damage by loss of credit; loss of ability to purchase and benefit from their good credit rating; detriment to their credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

251.     Defendants Equifax, Experian, and Trans Union's conduct, actions, and inactions were willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.  Alternatively, they were negligent, entitling Plaintiffs to recover under 15 U.S.C. § 1681o.

252.     Plaintiffs are entitled to recover attorneys' fees and costs from Defendants Equifax, Experian, and Trans Union in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## COUNT II
### 15 U.S.C. § 1681i
### Failure to Perform a Reasonable Reinvestigation
### (Second Claim for Relief Against Defendants Equifax, Experian, and Trans Union)

253.     Plaintiffs re-allege and incorporate by reference the allegations set forth in preceding paragraphs as if fully stated herein.

254.     The FCRA mandates that a CRA conducts an investigation of the accuracy of information "[I]f the completeness or accuracy of any item of information contained in a

consumer's file" is disputed by the consumer.  *See* 15 U.S.C. § 1681i(a)(1).  The Act imposed a 30-day time limit for the completion of such an investigation.  *Id*.

255.    The FCRA provides that if a CRA conducts an investigation of disputed information and confirms that the information is in fact inaccurate or is unable to verify the accuracy of the disputed information, the CRA is required to delete that item of information from the consumer's file.  *See* 15 U.S.C. § 1681i(a)(5)(A).

256.    On at least three occasions during the past two years, Plaintiffs disputed the inaccurate information with Equifax, Experian, and Trans Union and requested that they correct and/or delete a specific item in their credit file that is patently inaccurate, misleading, and highly damaging to them, namely, the late notation reported about their August 2023 payment history, in relation to Plaintiffs' mortgage with Defendant Carrington.

257.    In response to Plaintiff Seth's dispute, Equifax failed to conduct a reinvestigation, or such investigation was so shoddy as to allow patently false, logically inconsistent, and damaging information to remain in Plaintiffs' credit file.

258.    In response to Plaintiff Seth's dispute, Experian failed to conduct a reinvestigation, or such investigation was so shoddy as to allow patently false, logically inconsistent, and damaging information to remain in Plaintiffs' credit file.

259.    In response to Plaintiff Seth's dispute, Trans Union failed to conduct a reinvestigation, or such investigation was so shoddy as to allow patently false, logically inconsistent, and damaging information to remain in Plaintiffs' credit file.

260.    In response to Plaintiff Pamela's dispute, Equifax failed to conduct a reinvestigation, or such investigation was so shoddy as to allow patently false, logically inconsistent, and damaging information to remain in Plaintiffs' credit file.

261.    In response to Plaintiff Pamela's dispute, Experian failed to conduct a reinvestigation, or such investigation was so shoddy as to allow patently false, logically inconsistent, and damaging information to remain in Plaintiffs' credit file.

262.    In response to Plaintiff Pamela's dispute, Trans Union failed to conduct a reinvestigation, or such investigation was so shoddy as to allow patently false, logically inconsistent, and damaging information to remain in Plaintiffs' credit file.

263.    The Credit Bureau Defendants violated 15 U.S.C. § 1681i by failing to conduct a reasonable reinvestigation to determine whether the disputed information was inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which they received the notices of dispute from Plaintiffs; and by failing to maintain reasonable procedures with which to filter and verify disputed information in Plaintiffs' credit file.

264.    As a result of the Credit Bureau Defendants' conduct, action, and inaction, Plaintiffs suffered damage by loss of credit; loss of ability to purchase and benefit from their good credit rating; detriment to their credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

265.    The Credit Bureau Defendants' conduct, actions, and inactions were willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.  Alternatively, they were negligent, entitling Plaintiffs to recover under 15 U.S.C. § 1681o.

266.    Plaintiffs are entitled to recover attorneys' fees and costs from Defendants Equifax, Experian, and Trans Union in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

### COUNT III
### 15 U.S.C. § 1681s-2(b)
### Failure to Conduct an Investigation of the Disputed Information and Review all Relevant Information Provided by the Consumer
### (Only Claim for Relief Against Defendant Carrington)

267.    Plaintiffs re-allege and incorporate by reference the allegations set forth in preceding paragraphs as if fully stated herein.

268.    Defendant Carrington furnished the inaccurate information relating to Plaintiffs to the national credit bureaus, including but not limited to Equifax, Experian, and Trans Union.

269.    Defendant Carrington violated 15 U.S.C. § 1681s-2(b) by failing to investigate Plaintiffs' dispute, or otherwise by failing to fully and properly investigate Plaintiffs' dispute(s), including but not limited to failing to review all relevant information regarding the same; by failing to permanently and lawfully correct its own internal records to prevent the re-reporting of the inaccurate information relating to the Plaintiffs to the national credit bureaus, including but not limited to Equifax, Experian, and Trans Union; and, by failing to cease furnishing inaccurate information relating to the Plaintiffs to the national credit bureaus, including but not limited to Equifax, Experian, and Trans Union.

270.    As a result of Defendant Carrington's conduct, action, and inaction, Plaintiffs suffered damage by loss of credit; loss of ability to purchase and benefit from their good credit rating; detriment to their credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to

correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

271.    Defendant Carrington conduct, action, and inaction were willful, rendering it liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.  Alternatively, Defendant Carrington was negligent, entitling Plaintiffs to recover under 15 U.S.C. § 1681o.

272.    Plaintiffs are entitled to recover attorneys' fees and costs from Defendant Carrington in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for the following relief:

a)    Determining that Defendants negligently and/or willfully violated the FCRA;

b)    Awarding Plaintiffs actual, statutory, and punitive damages as provided by the FCRA;

c)    Awarding Plaintiffs reasonable attorneys' fees and costs as provided by the FCRA; and

d)    Granting further relief, in law or equity, as this Court may deem appropriate and just.

### DEMAND FOR JURY TRIAL

Plaintiffs are entitled to and hereby demand a trial by jury on all issues so triable.

Dated: June 18, 2024,                            **CONSUMER ATTORNEYS**

                                         By:      */s/ Levi Y. Eidelman*
                                                  Levi Y. Eidelman
                                                  300 Cadman Plaza West, 12th Floor
                                                  Brooklyn, NY 11201
                                                  T: (718) 360-0763
                                                  F: (718) 715-1750
                                                  E: leidelman@consumerattorneys.com

                                                  *Attorneys for Plaintiffs*
                                                  *Pamela Cohen and Seth Cohen*